IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JOHN DOE, by and through his
next friend, Amy Conner,

        Plaintiff,

v.                                    Case No. 12-2285-JTM

UNIFIED SCHOOL DISTRICT 233,
JOHNSON COUNTY KANSAS, et al.,

        Defendants.

MEMORANDUM AND ORDER

This matter comes before the court on a Motion for Summary Judgment (Dkt. 85) by defendants Unified School District 233 ("School District"), Jim McMullen, and Stan Dillon. For the following reasons, the court grants the motion.

## I. Uncontroverted Facts

*Introduction*

Plaintiff John Doe filed the present discrimination suit based on harassment he suffered as a seventh-grade student in the spring semester of 2012 at Mission Trails Middle School, one of the schools in the School District. At the time these events occurred, defendant Jim McMullen was the principal of Mission Trail and defendant Stan Dillon was a science teacher and boys' track coach at the school.

Doe began experiencing name-calling by two male eighth-grade students, I.S. and B.J., in February of 2012. For example, I.S. and B.J. would call Doe "lard ass," "faggot," and "asshole." Dkt. 86, Exh. A, pg. 82. No teacher or track coach at the school

ever heard the name-calling, and although Doe was bothered by it, he did not consider it to be bullying at first, believing the two students were "just being eighth-graders." At the end of March, Doe told Travis Waters—a middle school social studies teacher and track coach—that I.S. and B.J. were calling him names. Doe did not tell any other teacher or administrator about the name-calling before April 16.

*The Incident on April 16, 2012*

On April 16, 2012, the Mission Trail boys' track team had a team photograph taken in the gymnasium after school. Doe was seated in the bleachers in front of I.S. and B.J. while the boys waited for the photographer to finish taking photos of the girls' track team. During this time, I.S. and B.J. called Doe gay, ran their fingers through his hair, rubbed his hips, asked if he watched gay porn and whether men turned him on, and attempted to pull him down in between I.S.'s legs, before one of Doe's friends grabbed him and pulled him back.

At track practice after the team photo, Doe told Waters about the harassment, and he told Doe to tell the head coach, Stan Dillon. Doe told Dillon about the incident, and Dillon said he would talk to I.S. and B.J. Doe did not experience any further problems during track practice that day. When Doe's mother came to pick him up, he told her about what had happened. Doe described her reaction as "freaking out," stating that she immediately approached Dillon to speak with him. Dkt. 89, Exh. A, pg. 152.

*The Defendants' Response*

Before the school day began on April 17, Doe and his mother asked to speak with Principal McMullen. The three entered McMullen's office where they were joined by Student Resource Officer Brent Kiger, an active patrol officer with the Olathe Police Department. Doe and his mother reported to McMullen and Kiger that an incident had occurred the day before with I.S. and B.J. using inappropriate language and physical contact. Doe identified one other witness to the encounter, J.A., another seventh-grade student.[1]

Immediately following the meeting with Doe and his mother, McMullen met with Kiger, and they agreed that McMullen would interview I.S. and B.J. while Kiger would interview J.A., the other eye-witness Doe had identified. Ten minutes after concluding his meeting with Doe and his mother, McMullen interviewed both boys separately, starting with I.S. first. When asked about the incident during track photos, I.S. denied any involvement in the incident, but indicated that the eighth-grade boys were flicking the seventh-grade boys' hair and messing around with them. Dkt. 87, Exh. F, pg. 48–49. I.S. told McMullen that "it wasn't anything inappropriate" and that the boys "didn't do anything wrong." *Id.* at 49. He specifically denied making any comments about anyone being gay. Prior to this incident, I.S. had not had any disciplinary issues that McMullen was aware of, so McMullen believed he was being honest. McMullen told I.S. that he had made Doe feel uncomfortable and that flicking

---

[1] The plaintiff claims that Doe also identified another possible witness named T., but neither party provided any information regarding what T. might testify. Without T.'s testimony, the fact that he may have been a witness is an immaterial fact.

his hair and using the word gay derogatorily was inappropriate. McMullen admonished I.S. not to have any further contact with Doe, and warned him that if he did, he would face further disciplinary action.

After meeting with I.S., McMullen called B.J. to his office and confronted him with Doe's complaint. B.J. said the boys were all "messing with each other," and making comments about who was gay, but he did not admit to making these comments. B.J. admitted to flicking Doe's hair, as well as other students' hair. B.J. is smaller in stature than Doe and had not had any other disciplinary issues at Mission Trail prior to this incident. McMullen ended the meeting giving B.J. the same warnings he had given I.S.

Later that day, suspecting the boys may have left out some of the details, McMullen asked Dillon to interview them, believing they might be more forthcoming with a coach rather than the principal. Dillon agreed to speak with them, which he had already promised Doe he would do. Around ten o'clock that same morning, Dillon called each boy separately into his classroom, starting with I.S., and asked about what had happened the day before. I.S. denied any wrongdoing, and Dillon believed him. Dillon reminded I.S. that others looked up to him as a leader on the eighth-grade team and warned him that if his name was brought up again for other behavioral issues, he would be reprimanded. Next, B.J. told Dillon that some of the boys were messing with Doe's hair and calling him gay. Dillon told B.J. not to call anyone gay and said he would remove B.J. from the track team if he heard of any more similar incidents.

Dillon reported back to McMullen after speaking with the two boys. He also told Waters and the other track coaches that "some horse playing was going on" and that they should keep their eyes on the eighth-grade boys. Dkt. 87, Exh. B, pg. 27. Dillon did not take any further disciplinary action against I.S. or B.J., believing the conduct had not been severe, the boys had been adequately warned, and the administration would take any additional actions it deemed necessary.

In the meantime, Officer Kiger met with J.A., who said that I.S. and B.J. had bothered him while they were on the bleachers for the track team photograph. J.A. said the boys had messed with his hair, but he got up and moved away from them. He said the boys messed with Doe's hair, and Doe moved away from the boys about a minute after J.A. had left. J.A. did not corroborate any more of Doe's version of the incident. He did not see the boys touch Doe's body (other than messing with his hair), and he did not hear any of the comments Doe claimed I.S. and B.J. had made. Kiger reported to McMullen the outcome of his interview with J.A.

After Dillon's meetings with I.S. and B.J., and Kiger's interview of J.A., McMullen called I.S. and B.J. into his office once again, this time together. Even in front of B.J., I.S. continued to deny that he had played a part in the incident. Once again, McMullen reprimanded the boys, saying there was to be "no further contact, and if there's any other comments, statements, touching, anything, you know, we're going to move to the next step in the disciplinary process." Dkt. 87, Exh. F, pg. 62.

After the several meetings, Kiger prepared and filed a police report regarding Doe's complaint and his investigation of the event. Dkt. 87, Exh. G. Kiger called both

I.S.'s and B.J.'s parents to let them know their children would be listed in a police report. Also after the meetings on April 17, Dillon required I.S. to move his locker, which had been located next to Doe's locker.

*John Doe's Claims and the Present Motion Before the Court*

On June 19, 2012, John Doe, by and through his next friend, Amy Conner, filed his two-count Amended Complaint against the defendants.[2] In count I, Doe alleges the School District violated Title IX by acting "with deliberate indifference to known acts of harassment, intimidation and bullying toward Plaintiff and others." In count II, Doe asserts an equal protection claim under 42 U.S.C. § 1983 against the School District, and McMullen and Dillon in their individual capacities, alleging that they "deprived him of the full benefits of education because of his sex and/or gender." Doe seeks compensatory damages against all defendants and punitive damages against McMullen and Dillon, as well as reimbursement for costs expended, reasonable attorneys' fees and such other relief the court deems just and proper. Defendants filed their Motion for Summary Judgment (Dkt. 85) on March 8, 2013.

## II. Legal Standard: Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no

---

[2]Doe filed his initial Complaint on May 14, 2012. He filed an Amended Complaint on June 19, 2012, to revise his factual allegations. He filed a motion to file a Second Amended Complaint solely to correct the School District's legal name. The court allowed amendment of the Amended Complaint by interlineation.

genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' " *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

Finally, the court reminds the parties that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.*

## III. Conclusions of Law

### A. Doe's Title IX Claim Against School District

Title IX of the Education Amendments Act of 1972 states that no person in the United States "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A school district that receives Title IX funds can be liable in a private action for damages under Title IX if the school is deliberately indifferent to known acts of student-on-student sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999). A plaintiff must allege four factors to state a claim of school district liability under Title IX. He must allege that the district (1) had actual knowledge of and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir.) (citing *Davis*, 526 U.S. at 640–45).

*School District Did Not Have Actual Knowledge of Title IX Harassment Prior to April 16, 2012.*

In order to establish a Title IX claim, the plaintiff must show that the school had actual knowledge of the harassment. *See Murrell*, 186 F.3d at 1246. The plaintiff must show that he notified an "appropriate person" under Title IX—a school official with the authority to take corrective measures in response to the sexual harassment. *Gebser v. Lago Visto Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Neither the U.S. Supreme Court nor the U.S. Court of Appeals for the Tenth Circuit has provided a definitive answer as to exactly what type of school official qualifies as an "appropriate person" having authority to institute corrective measures on the district's behalf. And other circuits have declined to decide whether a teacher constitutes actual notice on the part of a school board. *See Brittany Ann Plamp v. Mitchell Sch. Dist. No. 17-2, et al.*, 565 F.3d 450, 458–59 (8th Cir. 2009) (cautioning that "[s]uch an approach would expand the scope of Title IX liability beyond that which Congress intended and would functionally open all educational institutions to liability based on a theory of respondeat superior or constructive notice—a move that the Supreme Court has clearly stated the statute does not contemplate."); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1286–88 (11th Cir. 2003) (determining that "in the context of student peer harassment, delineation of the notice requirement may prove to be difficult," and refraining from answering the notice issue); *David v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1372 n.6 (11th Cir. 2000) (leaving "for another day the task of delineating *Gebser*'s 'appropriate person' ").

John Doe argues that the School District had actual knowledge that he was being harassed at the end of March 2012, when Doe reported to Travis Waters that "I.S. and B.J. have been calling me names" and they "just wouldn't stop." It is undisputed that Waters is the only School District employee Doe told about harassment before April 16. In *Murrell*, the Tenth Circuit presumed that when a victim complains about a fellow student's action during school hours and on school grounds, teachers may well possess the requisite control necessary to take corrective action to end the discrimination. 186 F.3d at 1248. Here, Doe's complaints to Waters came at track practice—on school grounds and during a school activity—which is similar enough for the court to presume Waters had the requisite control to take corrective measures. The court, therefore, accepts as true that Waters was an "appropriate person" for purposes of Title IX liability.

However, the inquiry does not end there. The notice must be sufficiently detailed to alert the school district official of the possibility of the Title IX plaintiff's harassment. *Rost v. Steamboat Springs Re-2 Sch. Dist.*, 511 F.3d 1114, 1119–20 (10th Cir. 2008). Whether gender-oriented conduct rises to the level of actionable harassment depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved. *Davis*, 526 U.S. at 651 (citations omitted). Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. *Id.* Indeed, "at least early on, students are still learning how to interact appropriately with their peers." *Id.* "It is thus

understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id.* at 651–52. Title IX is not implicated for simple acts of teasing and name-calling among school children, even where these comments target differences in gender. *Id.* at 652. The Tenth Circuit has determined that "the boys are bothering me" is not sufficient notice. *Rost*, 511 F.3d at 1119–20.

Given these standards, the court holds that even if Waters was an "appropriate person," Doe's complaint of I.S. and B.J. calling him names did not give Waters notice of the type of discrimination Title IX prohibits. *See Davis*, 526 U.S. at 652; *Rost*, 511 F.3d at 1119–20. I.S. and B.J. were calling Doe names, such as "lard ass," "faggot," and "asshole." These names are certainly inappropriate in any setting. However, middle school boys are not held to the same societal standards as adults, and name-calling alone—even when it targets differences in gender—will not support a Title IX claim. *See Davis*, 526 U.S. at 651–52; *but see Theno v. Tonanoxie Unified Sch. Dist. No. 464*, 394 F. Supp. 2d 1299 (D. Kan. Oct. 18, 2005) (upholding a jury verdict for plaintiff who was called "faggot" and harassed for four years due to his failure to conform to stereotypical gender expectations). The court notes that the homophobic slur was one in a variety of generic middle school insults, and Doe does not claim he was called names because of his gender or sexuality. Additionally, in his own deposition, Doe says he waited to tell anyone about the name-calling because he believed I.S. and B.J. were "just being eighth-graders," indicating that this was not conduct beyond the norm for this age group. *See Davis*, 526 U.S. at 651 (listing the age of the harasser and victim as two factors in a

11

"constellation of circumstances" a court must consider). This name-calling lacked additional harassing conduct, and Doe tolerated it for nearly two months before telling anyone, demonstrating its non-severe nature. Accordingly, the court holds that the School District did not have actual knowledge of "severe, pervasive, and objectively offensive" harassment suffered by Doe before April 16. The proper timeline of Doe's Title IX claim begins on April 16, 2012, with the incident during track team photos.

*School District's Response to the Known Harassment Was Not Deliberately Indifferent*

This court assumes for purposes of summary judgment that the harassment of Doe by I.S. and B.J. on April 16 was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."[3] *Davis*, 526 U.S. at 650. Even so, the court finds that the School District's response to the known harassment was reasonable and not deliberately indifferent. Therefore, the School District is entitled to judgment as a matter of law on this claim.

---

[3]The court notes that whether the harassment was sufficiently severe is immaterial for summary judgment because of the School District's reasonable response. Without holding on the issue of the severity of the harassment, this incident does not strike the court as being so objectively offensive that it merits a lawsuit. Additionally, the court notes that the harassment does not appear to have deprived Doe of any educational benefits provided by the school. Doe missed several days of school after the incident, but some were because he had injured his arm at track practice and required a sling and pain medication. Staying home from school for days after this incident does not strike the court as a reasonable response to the incident, and the court would not attribute this as the fault of the School District. Additionally, it was Doe's mother, rather than the School District, who restricted Doe's participation in track by forbidding him to go to a track meet if she was not available to drive him. Finally, Doe claims that the incident affected his grades, because from the third quarter to the fourth, his grades in Algebra I and Band fell one letter grade each. But Doe provides only a correlation in time as evidence and does not present any causation evidence for this claim. The effects of this harassment are unlikely to have caused the drop in Doe's grades in two of his classes while the rest of his grades remained unchanged.

To avoid deliberate indifference does not require the school to "remedy" peer harassment. *Rost*, 511 F.3d at 1123. *Davis* does not imply that the school must necessarily expel students who engage in sexual harassment or that victims of harassment have a right to make particular remedial demands. *CRK v. USD 260*, 176 F. Supp. 2d 1145, 1162 (D. Kan. Nov. 9, 2001). Indeed, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id*. (citing *Davis*, 526 U.S. at 648). School officials will be deemed "deliberately indifferent" only where the school's response to the harassment "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

The School District in this case quickly and effectively responded to Doe's complaint. Doe and his mother spoke with Principal McMullen on April 17, the day after the incident. By the end of that same day, McMullen and Dillon had met with and reprimanded I.S. and B.J. three different times, in part to determine exactly what had happened and also, to threaten the boys with further discipline if anything else happened. Dillon specifically threatened to kick the boys off the track team if it happened again. Also on April 17, Kiger interviewed the other eye-witness Doe had identified, and by April 18, Kiger filed an official police report on the event and called I.S.'s and B.J.'s parents. Dillon reassigned I.S.'s gym locker, which had previously been located next to Doe's. Dillon also spoke with other track coaches, asking them to be on

the watch for future problems. Perhaps most importantly for Doe, he has not experienced harassment of this nature from I.S. or B.J. since that day.[4]

Doe does not dispute these facts, but nonetheless argues that the School District was deliberately indifferent. He argues that after I.S.'s and B.J.'s denials, Dillon and McMullen should have probed them harder about the details. He argues that Kiger's report is incomplete. He argues that had a girl alleged the same harassment he experienced, I.S. and B.J. would have been subjected to greater discipline. He argues that I.S. and B.J. committed a Class II offense under the Code of Student Conduct, which he alleges "should have resulted in a suspension at least."

The court finds that the School District officials acted reasonably in response to the known circumstances. *Davis*, 526 U.S. at 648. After immediately conducting interviews about the incident, School Officials could only corroborate parts of Doe's allegations. Between the two students who had allegedly bullied Doe and one of Doe's friends who also had been picked on, the only details of Doe's story the School District officials could verify were that the bullies had run their fingers through his hair and made homophobic remarks. Unfortunate as this may seem to a concerned parent, these circumstances pointed to essentially immature horseplay commonplace among middle

---

[4]This fact is not genuinely in dispute. Following the School District's interviews concerning the incident, Doe overhead I.S. speaking to the gym teacher, Coach Rundberg, in the locker room. I.S. stated out loud: "Apparently, I sexually harassed someone." Dkt. 87, Exh. A, pg. 178–79. The students on the track team were present in the locker room when I.S. made this statement, but Doe does not know whether any of them heard the statement. Although I.S. never used Doe's name to identify who was accusing him of sexual harassment, Doe was offended by this statement and reported it to Kiger. Kiger told McMullen, who followed up with Rundberg. McMullen then spoke with I.S. about his conversation with Rundberg, and told him to "let it go," and quit talking about it. Since then, Doe has not reported having any problems with I.S. or B.J. The court finds this single incident so benign as to be immaterial to the claims before it.

school boys. And the School District was certainly not deliberately indifferent to these known circumstances. It was reasonable for administrators to conduct interviews to hear as many versions of the story as possible. Even after Kiger interviewed one of Doe's friends who also had experienced the bullying, the general picture that formed from the different versions did not include the more offensive details of Doe's claims.

This court will not second-guess the disciplinary decisions of the School District. *See CRK*, 176 F. Supp. 2d at 1162. The several discussions the school officials had with I.S. and B.J. the day after the incident foreclose on the claim they were deliberately indifferent. "Although plaintiff characterizes these responses as essentially 'doing nothing,' counseling or talking with students is a typical first step in addressing discipline problems, and given the nature of the reported incidents above, the response was not clearly unreasonable in light of the circumstances known to the school." *CRK*, 176 F. Supp. 2d at 1164. Even if this incident rose to the level of a Class II offense as Doe argues, an in-school conference with the student is the first disciplinary option listed for first time Class II Offenses in the Code of Student Conduct. *See* Dkt. 94, Exh. J, pg. 11. The Code of Conduct also states: "Each principal has the authority to use discretion and common sense in enforcing the Code of Student Conduct." *Id.* at 10. Both I.S. and B.J. had clean disciplinary records before this incident, so the in-school conferences were within the Code's guidelines, and the court finds that McMullen used appropriate discretion and common sense in employing this method of punishment.

Doe's allegation that the School District would have handled the harassment differently if he had been a female is irrelevant to the Title IX claim. Title IX does not

require schools to treat the same harassment as equally offensive to the victim regardless of the victim's gender, nor should it. Title IX only requires that the institution not be "deliberately indifferent." The court finds that the School District was not deliberately indifferent, but rather, it acted in a reasonable manner that effectively remedied the situation and prevented future harassment—a result that Title IX does not even require. *See Rost*, 511 F.3d at 1123. Doe's claim that Title IX requires absolute consistency in approaching harassment claims made by males and females is simply incorrect.

Further, victims of harassment do not have a right to make particular remedial demands. *See CRK*, 176 F. Supp. 2d at 1162. Doe would require his bullies to be suspended for a couple of days, a remedy that Title IX does not require. *See generally id.* How would this have been any more effective than the School District's approach? First, Doe himself stated in his deposition that he expected the bullying to stop after the April 16 incident, because he had heard that I.S. and B.J. "had gotten talked to by the coaches." Dkt. 89, Exh. 1, pg. 140. In other words, even Doe himself believed the School District's remedial actions were going to work. Second, Doe claims to have missed eight days of school because of his fear of getting harassed again. If true, which the court accepts for purposes of this motion, suspending the boys for two or three days would not have been sufficient to allay Doe's concerns.

The court holds that Doe's Title IX claim against the School District must fail because the material facts are not genuinely disputed and the School District is entitled to judgment as a matter of law, as explained above.

B. Doe's § 1983 Claim Against All Defendants

The court next addresses Doe's claim under 42 U.S.C. § 1983. Doe alleges that the defendants' actions deprived him of his constitutional right to equal protection of the laws under the Fourteenth Amendment. Doe's § 1983 claims fail at the summary judgment stage for much of the same reasons as his Title IX claim.

The Fourteenth Amendment to the United States Constitution provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983. *Murrell*, 186 F.3d at 1250.

*School District's Liability for Sexual Harassment Under the Equal Protection Clause*

Doe's complaint states that he claims a violation of equal protection by "All Defendants," which includes the School District, McMullen, and Dillon. The court first analyzes his equal protection claim against the School District.

"In order to establish municipal, or in this case School District, liability for sexual harassment under the Fourteenth Amendment, a plaintiff must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority." *Id.* (citing *Randle v. City of Aurora*, 69 F.3d 441, 446-50 (10th Cir. 1995)). To subject a governmental entity to liability, "a municipal policy must be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by a municipality's officers." *Id.* (citing *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir.

1996)) (inner-quotation marks omitted). Absent such an official policy, a municipality may also be held liable if the discriminatory practice is "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (citing *Lankford*, 73 F.3d at 286) (inner-quotation marks omitted).

Even the most liberal construction of Doe's complaint fails to reveal any allegation that the School District was deliberately indifferent to sexual harassment as the result of an official policy. *See id.* at 1249. Acts that do not rise to the level of official policy may nonetheless create liability if they are sufficiently widespread and pervasive so as to constitute a "custom." *Id.* at 1249–50 (citing *Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir. 1989)). However, acts of sexual harassment by one student directed solely at another do not demonstrate a custom or policy of the School District to be deliberately indifferent to sexual harassment as a general matter. *Id.* at 1250 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 & n.56 (1978)).

The complaint does not indicate that either McMullen or Dillon possessed the "final policymaking authority" required for establishing municipal liability under § 1983 on the basis of a decision specific to a particular situation. *See id.* As a result, Doe has failed to plead a proper § 1983 claim against defendant School District and the School District is entitled to judgment as a matter of law.

> *Liability of McMullen and Dillon for Sexual Harassment Under the Equal Protection Clause*

Unlike a state or municipal institution, "a governmental official or supervisory employee may be held liable under section 1983 upon a showing of deliberate

indifference to known sexual harassment." *Murrell*, 186 F.3d at 1250. Although conduct by a state actor is required in order to support a claim under section 1983 and the primary conduct in this case is that of students, the Tenth Circuit has found the possibility of state action where "a supervisor or employer participates in or consciously acquiesces in sexual harassment by an outside third party or by co-workers." *Id.* (citing *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994)). "Liability under § 1983 must be predicated upon a deliberate deprivation of constitutional rights by the defendant and not upon mere negligence." *Id.* (citing *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)). To state a claim of "deliberate" discriminatory conduct, Doe must prove "defendants actually knew of and acquiesced in" I.S. and B.J.'s behavior. *Id.* (citing *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995)). The standard is similar to the one used to determine School District's liability under Title IX. *See DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012).

Doe does not allege that defendants McMullen and Dillon had any knowledge of I.S. and B.J. calling him names or harassing him prior to the incident on April 16, 2012. As Doe stated in his response to the Motion for Summary Judgment, the only matter in dispute for his § 1983 claim is whether McMullen and Dillon responded with deliberate indifference on and after April 16, 2012. Doe alleges that McMullen and Dillon intentionally discriminated against him on the basis of his gender. He claims they consciously acquiesced to the harassment Doe was suffering. Specifically, Doe claims that McMullen and Dillon failed to take corrective measures to remedy and prevent harassment against Doe, because he is a male student. If he had been a female student,

Doe claims, McMullen and Dillon would have suspended I.S. and B.J. Doe supports this claim by providing several cases of male students harassing female students at Mission Trail Middle School where the harasser was suspended as a punishment.

The court grants summary judgment to McMullen and Dillon. Doe's claims suffer from confusion about what equal protection entitles him to. Equal protection entitles Doe to McMullen and Dillon not showing deliberate indifference or worse in the face of his harassment claim, regardless of his sex or gender. As the court has already stated, their reaction was well above this standard. They followed the school's discipline code, which quickly and effectively stopped I.S. and B.J. from further harassing Doe. It is undisputed that Doe has not suffered further sexual harassment by I.S. or B.J. since McMullen and Dillon responded to his claim.

Doe's right to equal protection does not entitle him to having his harassers punished in a manner equal to how harassers of female students are punished. The school administrators have broad discretion in determining punishments, so long as they are not deliberately indifferent. That discretion includes tailoring the punishment in a manner that will prevent future harassment by the perpetrators, rather than punishment based solely on what would be just in the eyes of the victim. In other words, a school may base its disciplinary decision on deterrence and rehabilitation, rather than retribution.

The court notes that all of the examples of male harassers being suspended for harassing female students present circumstances distinguishable from Doe's incident. In every example, the harassing male student had one or more prior offenses, or the

behavior warranting the discipline is distinguishable from Doe's case because it is much more severe or was accompanied by additional acts like "Defiance of Authority." Perhaps more importantly for Doe's claim against these defendants in their individual capacities, there are no facts showing that McMullen or Dillon imposed the discipline in any of these examples. Without these facts, there can be no claim that McMullen or Dillon personally treated Doe any differently than similarly-situated female students.

The court finds that on the undisputed facts, McMullen and Dillon are entitled to judgment as a matter of law because they were not deliberately indifferent to and did not acquiesce in Doe's harassment. *See Murrell*, 186 F.3d at 1250. Accordingly, the court grants summary judgment to the defendants.[5]

IT IS THEREFORE ORDERED this 31st day of July, 2013, that the defendants' Motion for Summary Judgment (Dkt. 85) is granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[5]Because the court has held McMullen and Dillon were not deliberately indifferent, it does not address whether McMullen and Dillon are entitled to qualified or absolute immunity.